Blizzard or Blizzard? Blizzard. Like a blizzard. Yes, sir. Good morning. May it please the court. As a preliminary matter, I'd like to briefly discuss the court's standard of review in this case because the government has made an issue in its brief. The government contends that this court should rely on the district court's findings as to a seizure because it is a factual finding not to be disturbed for clear error. However, in reviewing the government's cited cases and the applicable case law, the government relies on the Mass case, which essentially in the Mass case, that court applied the seizure because the finding of a seizure in this case would depend wholly on the legal conclusions and so it becomes a mixed question of law. In this case, the question was whether or not Monsivais was detained by the use of emergency lights, by the use of commands and things of that nature, and so the detention did or did not occur was contingent on its application of the law as to whether emergency lights rose to the level of a detention. So we believe that this court should review all of the facts that determine whether a seizure occurred on a de novo review. The second thing that I would like to cover is that in all the government's cases cited for detention as to the use of emergency lights in the course of detention really are not telling to this case. This case stands out from the government's cited cases because this occurs in the daytime, it occurs with a pedestrian, and the government is keen to point out that the cases cited by Monsivais are not pedestrian cases. You know, we cited a case, the Swindle case from the Second Court of Appeals, and that a reasonable person would understand that red and blue lights are there to detain you, and that applies to emergency vehicles. You know, my personal view, just speaking for myself alone, is that emergency lights is by far your weakest argument, and they said it was dusk, it was getting toward evening, was it not? And that's when you have to have some lights on. It's wise to have lights on so that cars behind you will know that you're there. Well, Your Honor, one thing I would like to address on that is that in this situation, the officer testified that he activated his emergency lights, and the situation, the factual situation, is they're on a divided highway, and so he's on a highway where there's only traffic moving his direction, and so if he's directing his lights forward towards Monsivais, who's walking in front of him, then he is not alerting any traffic. The lights simply go towards Monsivais. They don't go toward any traffic, all of the traffic. Well, I'm sorry, but we all know that everybody who sees police emergency lights flashing on the side of an interstate is immediately going to slow down to 50 miles an hour, because everybody can see them on both sides, and in this case, again, it's getting toward dusk, and people's vision is not necessarily, I mean, it just seems to me that the safety rationale for activating the lights is quite compelling. Yes, ma'am, I understand. If the court is unconvinced about just the use of the emergency lights, then we termed the second phase that Monsivais would have been detained, and that was when Officer Baker stepped out of the vehicle, and he began to issue commands and essentially stopped Monsivais from moving by talking to him. One of the first things he says to Monsivais is to take your hands out of your pockets. This, to a reasonable person, I believe, would be construed as a restraint of hand to do something, and so if you're restrained in movement from taking your hands from your pockets, then a reasonable person would interpret that you're restrained in your movement from leaving, and so we believe that the restraint of movement would apply to have stopped Monsivais in that case. Additionally, Your Honor, just to speak to that point, one of the cases cited by the issue, and the government pointed out that they believe that the use of the emergency lights went to show that the vehicle was just there to use for assisting a broken-down motorist. However, in that case, the officer activated only his amber lights on his bar, yellow lights that would still alert others to his presence, but not red and blues that are there traditionally thought up to be amber lights. I think we all interpret as there is assistance, but red and blues, we interpret as detention. You know, until you made that argument, I had never understood that to be a distinction. Maybe I'm just a dumb driver, but I always thought flashing lights are flashing lights, and you better pay attention, and I didn't know that there was some significance to the color. Yes, ma'am. I believe if this case were brought in a different context, if it were brought as an evading arrest case, I think that those distinctions would make a difference, because I think everyone understands that red and blue lights, if you see them behind you, you are getting pulled over, or if they're directed in your general direction, you're being detained. If yellow lights are being used, this is something thought of more as traditionally as, you know, just kind of, hey, I'm here, rather than... You're going seriatim, but what's the strongest argument you think you have here? I don't think it's flashing lights, was it? No, sir. I know you're trying to cover them in sequence, but you're going to sort of run out of time. I mean, what's the, if we don't buy that one, etc., I mean, what do you feel? Yes, sir. Undeniably, you know, there's a seizure. What's your strongest argument in here, without abandoning any of the rest, but just, what are you going? I mean, you said, take your hands out your pocket. You think that is, but what? But, I mean, if not that, what? Well, Your Honor, it is the fact that there was no reason to frisk Monsivais. There was no reasonable suspicion that he had committed any offense. The only suspicion that they had was that Monsivais was, he was nervous, and he did not want, he kept putting his hands back in his pockets, but the officer, and I believe this court can rely on the Dortch case and the cases that, that there's no, there was no limited by this court, but there's no reasonable suspicion that the officers needed to conduct a pat-down. There was no, the officer testifies that there was no threat to him, there was no perception that he had any weapons, and the officer testified over and over again on direct and cross-examination that he did not believe that Monsivais had committed any crime or was about to commit a crime, and so with this being the standard for stopping anyone, he didn't have any basis to stop anyone. You know, the consensual encounter turned into a detention just based off of the fact that he wanted it to become a detention, rather than there being anything that led to it. Well, I'll agree with you, that's a, that's a good point. I think the officer said he had no suspicion of a particular crime, because you were trying to tie him down in your questioning to a particular crime suspicion, which the officer didn't have, but on the other hand, both officers apparently were quite, found his behavior very unorthodox, and you know, what struck me and my chambers when we were looking at this is the fellow walking right by the police car, you know, out in, apparently in the middle of nowhere, and he's just going to walk by as if nothing is happening. Surely that was suspicious. Yes ma'am. The, what I believe that the court can look at to consider this is, you mentioned that he testified that it was a specific, whether he committed a specific offense, but he was also questioned whether he had committed any offense, and so I believe that both were covered. He was trying to be nailed down to a specific offense, but at the same time, he did, he never testified that he had done anything of a criminal activity nature, I believe is what the transcript shows. The, the Dorch case, I believe, is telling because even if the officers had reasonable suspicion in this case, their reasonable suspicion would have been of what, of what crime? They would have been thinking maybe he was intoxicated, maybe he was high on some controlled substance, maybe he was involved in some other criminal activity, but there was nothing there to ever believe that Monsivais was involved in possession of a firearm. Well, suppose they had thought he was high on drugs. I mean, I, I, you know, just because of his reflex actions and the nervous, apparently demonstrable nervousness, suppose they think he's high on drugs, and suppose they think for his but suppose they do think that for his safety, they're going to need to put him somewhere, like a drunk tank or something. Wouldn't they have to frisk him before they were doing anything like that? It may get to that point, but I believe at this point that the testimony established that there was a matter of just two or three, four minutes before, from the time they got out of the car until they attempted to frisk him, and so there was no ferreting out of that issue. If they had reasonable suspicion that he was intoxicated, you know, they could have asked such questions, or they could have asked, you know, if he had any sort of mental issues or anything like that, delving into reasonable suspicion of some particular offense or some, some basis to maybe frisk him at a later point, but at the point that they did frisk him, they'd had no reason to, and I believe it's the fact that there's a requirement, not only that they have reasonable suspicion of, that a crime has occurred, but a reasonable suspicion that Monsivius is armed and dangerous, and there's no reasonable suspicion that Monsivius is armed and dangerous in this case. The closest that anything gets to that is putting your hands back in your pockets over and over again, but he never bulges, he says that he was very polite, he was not threatening in any manner, and so we believe that the government ignores the issue because it essentially has no response, but under Arizona v. Johnson and the Fifth Circuit's interpretation, there has to be reasonable suspicion that Monsivius is armed and dangerous. Let me ask you, where's your client now? He's in federal prison. No, he was let out, I thought. Oh, I'm not aware, ma'am, I don't know. He may have been, I don't know. Well, according to our records, he only had a 16-month sentence, and he was put in, like, 12 months ago, and, okay. I was unaware of whether he was or not. Are you retained or court-appointed? Court-appointed. Okay. Yes, ma'am. Sorry. No, that's okay. You haven't talked to him in 12 months? No, sir. Did you let him know that the case was going to be argued? Yes, ma'am. Oh. Yes, ma'am.  You sent him letters where you think he is. Yes, sir. That's right. Yes, sir. Essentially, I believe, and Your Honor asked earlier what you believe our strongest point is, or what I believe the strongest point is. I believe the strongest point is they didn't have reasonable suspicion to detain him, and even if they had reasonable suspicion to detain him, they didn't have reasonable suspicion to believe that he was armed and dangerous. And so, for those reasons, we would ask that the court reverse this case for a new trial. All right. Thank you. Thank you. All right. Thank you, Mr. Booth. We have your argument. All right. We'll hear from the government. Mr. Stoltz, is that correct? Yes, Your Honor. Brian Stoltz from the U.S. Attorney's Office. May it please the Court. I will address first the reasonable suspicion issue, whether or not there was reasonable suspicion. I think it's fairly clear that this encounter started as a consensual encounter in that it was essentially a welfare check by the officers on what they believed to be and what effectively was a stranded motorist since they saw the disabled truck that Mr. Montevious was walking away from. Now, in the course of the few minutes of talking to Mr. Montevious and trying to figure out what the problem was, asking him, do you need a ride somewhere? Did you run out of gas? The officers noticed that Mr. Montevious, one, did not know where he was coming from. Two, he gave an explanation of where his destination was. Did they ask him about his car and did he need gas? Yes, Your Honor. They did ask him about his car. The Deputy, Deputy Baker, testified that immediately upon encountering Mr. Montevious, he asked, what's going on? Are you needing assistance? Did you run out of gas? Questions of that nature. And I believe Mr. Montevious eventually explained that he had run out of gas, but by that point the officers had developed these other issues and had other reasons to detain him at that point. So the reasonable suspicion that arose in the context of this consensual encounter was Mr. Montevious's not knowing or not being able to say where he was coming from, claiming that he was headed to Fort Worth when in fact the evidence pointed to the contrary because his car was pointed in the westbound direction away from Fort Worth. Unusual demeanor for a person who was apparently stranded on the highway. Deputy Baker testified that he routinely came across either hitchhikers or people who had run out of gas or had other vehicle problems on that stretch of Interstate 20. It's in a remote area, as Judge Jones noted. Normally these people would be welcoming of the assistance and he said that this individual's demeanor was not what would be expected in that context. So just another factor that shows that something is suspicious here. The unusual nervousness is also a factor under the case law. And reasonable suspicion is not a high barrier. The case law makes clear it's not the same as preponderance of the evidence. It's not the same as probable cause. It's really a low barrier. Is there something that in this officer's judgment and experience he's noticed that justifies a brief further investigation? So in the continuum of time, you know, as you say, welfare check, where do you say, you know, if anywhere, sort of in the continuum, you know, you move from way back here to we turn to the other side of the highway, see the car, to out and moving down. Where, if any place, you know, do you say it changes or the factors the officers have been accumulatively or something? You follow me? Yes, Your Honor, I understand. I think within a few minutes of talking to Mr. Monsivais, the officers had determined what I've just laid out about him not being able to say where he's coming from, these other factors. I think at that point it's moving into the point where the officers have enough information now where they're justified to conducting what would be called a Terry stop in the sense that they can actually detain the individual and for the purpose of figuring out, you know, this is suspicious, there could be an innocent explanation, but at the same time there's something here we need to figure out what's going on. And I say that at that point it's a Terry stop because once it transforms into a Terry stop, where there is the reasonable suspicion, at the same time the case law is clear that the officer is entitled to essentially ensure his own safety and the safety of others during that Terry stop by conducting just a very cursory pat-down. And that's what occurred here. Once the officers had some reason to believe that there was something going on here that was not entirely innocent, perhaps, at that point the officer was justified based on that information and also based on the information of what he observed. Mr. Monsivais' hand movements, his jittery nature, these are the sort of things that the cases show can allow an officer to conduct this brief pat-down just to ensure his own safety and the safety of others for the duration. I thought that what happened was the officer said, before anything else happened, said, I'm going to frisk you. And have we got the cases mixed up? And this man said, I have a .45. That's true that that did happen, although it didn't happen immediately. So first there was the, during what we call the consensual encounter, first there were the questions about, hey, what's going on? Is your car broke down? Do you need a ride? Did you run out of gas? Did you have some vehicle problem? Those questions occurred first. Later, once the answers to those questions created this sort of suspicion and the officers had had time to observe Mr. Monsivais' hand movements, he kept putting his hands in his pocket, he was acting jittery. At that time, that's when the officer said, I'm going to go ahead and do a pat-down. And at that time when he said, I'm going to do a pat-down, Mr. Monsivais effectively volunteered, I have a .45 in my waist. And the officers then grabbed it. So that's how it occurred. It did occur in that manner, but it wasn't immediately. It was further into the scenario. So the question was posed, was there any reason to think that Mr. Monsivais at this point was armed and dangerous? Because, again, the officer needs some reason to think that the person with whom they're dealing is armed and dangerous in order to justify this pat-down. I think the Micheletti case, or Micheletti case, it's an in-bank decision, is a good sort of point to consider on that. Because in that case, the individual, an officer was conducting a terrorist stop of a group of individuals outside of a bar. One of these individuals had been acting in a suspicious way by essentially running from the side of the police. When the officer was talking to those individuals, another individual walked out of the bar with his hands in his pocket, and the officer essentially immediately went over and patted that person down for weapons. And, in fact, a weapon was found. But in that case, the officer had very little contact with the actual subject before the decision was made to do the pat-down. Well, relevant to that, I was surprised that the government attorney didn't focus more on, at this suppression hearing, on the fact that here you are in the middle of nowhere, and this fairly well-dressed fellow ought to be asking for help, and instead he's determined to walk right by the police officers. I mean, nobody seemed to focus on that. Yes, Your Honor, I think that—I don't know how much of a focus it was. I think it was clear from the deputy's testimony that this individual was—he was seemingly well-dressed, seemingly like just a person. Yeah, but he's going to ignore them. They're the only obstacle in his course on the big interstate. I mean, it's just very bizarre to me. I agree, Your Honor. Maybe they just thought that would speak for itself. I don't know. I think that's right, Your Honor, and I think it was discussed in the context of the deputy testified that this was very unusual, that he would come across a person in this environment, and the person would act this way, as opposed to a normal encounter where the person would say, oh, thank goodness you're here. I really appreciate it. Can you give me a ride to the gas station? So it's a low bar. When you say he was unable to say where he was coming from. Yes, Your Honor. He was asked, where are you coming from? And he said, I don't know. Something to that effect, yes. It's an effect of, you know, what are you doing? Where are you coming from? He wasn't able to articulate where he was coming from, and likewise explanation of where he was going was at odds with his apparent travel plan. So reasonable suspicion arises. It's a relatively low bar. I'll say I don't have any answer questions about the lights. I think that that's pretty straightforward from the record that this was a welfare check on a stranded motorist. It would be perfectly reasonable to use lights in that situation. You're right on the side of the highway. In fact, if you watch the video, Mr. Montevious is walking down the shoulder. Once the car stops, there's semi-trucks and trucks and cars that are speeding by, you know, just feet away in the highway. So the use of lights is reasonable in this situation. Our internal records say that he was due to be released on November 20, 2015, and then that he was released. Do you know anything about that? I believe it's correct according to the Bureau of Prisons' record locator, which is a public document. I believe he has been released, Your Honor. My understanding is he's still under some kind of supervised release term, though. Not deported in any case. I'm sorry? Not deported in any case. As far as I know, I have no information as to whether he has been deported or not. So the district court's findings in this case were made after a hearing with multiple witnesses. The district court got to observe these witnesses. On the standard of review, the mask case that counsel cited is pretty clear that the question of whether a seizure has occurred or whether it was a consensual encounter, that is a fact finding. That is reviewed for clear error. Now, the entire question of did the facts that were found by the district court truly create reasonable suspicion, that is what is subject to de novo review. So I don't think there's a disagreement there. For example, here, the conclusion that it was a consensual encounter initially, that is something that would be a finding of fact subject to review for clear error. So we believe the district court's findings are well supported by the record. They're not erroneous under the clear error standard. When did it stop being a consensual encounter? I'm sorry, when did it stop being a consensual encounter? Right around the time that the officer told Mr. Monsivais that he was going to conduct a pat-down. At that time, enough information had accrued and there had been enough chance to observe Mr. Monsivais that his suspicious actions and answers justified a detention. You can't point to any one thing. I'm sorry, Your Honor? You can't point to any one thing. I think it's in terms of any one answer from Mr. Monsivais. Any one fact. I think it's a combination of all the facts. He transformed it from a consensual encounter to a seizure, a detention. I think it was the facts of his answer. I don't think there was one particular question, but it was a cumulative effect of all the different factors together. Once the officers had observed him for a somewhat... Did it occur before the officer said, I'm going to pat you down or I'm going to frisk you? Yes, I think at the time the officer said, I'm going to pat you down. At that time, there was sufficient evidence and sufficient observations had been made to transform it into a terror assault. We read the record and we don't think it's sufficient. Wouldn't you agree that that is a seizure? I would agree, yes. At the time the pat-down occurred, I think that would be essentially a terrorist stop. That is a form of seizure, and you need to have reasonable suspicion to do that. We agree with that. We think there was ample reasonable suspicion at that time. We would ask the court to affirm. If there's any other questions, I'm happy to answer them. Thank you. Thank you, Your Honor. All right, Mr. Blissett, any rebuttals? Thank you. I'd like to address a few things that were brought up by the government and then address a few things we discussed previously. The court was concerned that perhaps Officer Baker was only being asked about a particular crime. However, if the court will reflect on the record on 183, there is a discussion had between defense counsel and Officer Baker in which he indicates he didn't suspect him of any criminal act at that time. At the time that he encountered him, began asking questions, he didn't. At the time that he asked to pat him down for weapons, he didn't suspect him of any criminal act. And his statement is, I wouldn't say a criminal act, no. He was just acting suspicious. So it begs the question, suspicious of what? Suspicious of not a criminal act. So just acting strange is another way to put that, acting suspicious. And so we believe that the officer admits, freely admits that he did not have reasonable suspicion that a criminal activity was afoot. There was nothing going on that he believed needed to be investigated and detained for that purpose. Additionally, the court inquired of government's counsel regarding what offers there were or what conversation was had. And I believe the conversation that takes place between Monsivais and Officer Baker, when he's subject to cross-examination, Officer Baker admits he never actually offered him a ride. He never actually offered him gas. He makes this general statement during his direct examination, I was there to offer help, I was there to see what he needed, but he never actually did those things. He only just asked where he was going, where he had come from. Now, that's not exactly right because there is, I think it's pretty much uncontroverted, he asked him if he needed assistance. I think he made a general statement, you need some help, is what he says. But he never really says what he said. He just says, I came out there to offer him some assistance, but he never actually offered any sort of assistance. But this whole encounter was not just a pretext to frisk him. It had a reasonable cause. Sure. Yes, ma'am. So the government, in their argument, states that they believe there's ample reasonable suspicion. However, the only facts you have is you have a well-dressed man acting nervous, in which Officer Baker admitted that individuals who encounter the police sometimes act nervous. Even if this had been a situation where Monsivais was nervous because he's an illegal alien, that's not a basis for detention on the fact of committing a criminal offense. And there's just, there's not ample. All there is is that, him putting his hands back in his pockets several times. As Your Honor pointed out, perhaps the walking around the vehicle is suspicious to this court, but the officer did not note that he found it suspicious. It was never made a basis of suspicion by the government. So we believe that the reasonable suspicion was deeply lacking, and especially no reasonable suspicion that he had actually possessed a firearm, that he was armed and dangerous. There was no reason to believe that. Unless the court has any questions for me, I'm done. Well, I mean, if, just for the sake of, if your client was released from prison five months ago, suppose he went back to Mexico, normally doesn't that suspend an appeal if they've fled the jurisdiction? I mean, I can talk to my colleagues about this, but I would just, I don't like ruling on advisory opinions or hypothetical situations, and it might just be good to know if you could be in contact with your client. Yes, ma'am. I mean, he may be in Dallas under supervised release for all we know, but. . . I believe that the testimony at trial supported the fact that Monsivias was a longtime resident of the United States, and so I believe he would still be here unless he was deported. That's my knowledge of it. Well, I know, but he's your client. Yes, ma'am. Yes, and he hasn't had any contact with me or written any letters or anything, so I'm unaware of where he is. All right. We'll check on it. Thank you. Thank you to both sides. Thank you, Your Honor. This is your court appointed, and the court appreciates your service not only in this case, but in all the ones that you and others take up to bring these cases to us. Thank you, Your Honor. Appreciate it. Thank you. All right. We'll call up the next case, Bruce Ibey et al. v. Gerald Wayne Jones.